UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ORLANDO MANUEL BOBADILLA, | Case No. 07-CV-1649 (PJS/RLE) |
| Petitioner, | |
| | ORDER GRANTING 28 U.S.C. § 2254 |
| v. | PETITION FOR |
| | WRIT OF HABEAS CORPUS |
| WARDEN TERRY CARLSON, | |
| Respondent. | |

Lynne A. Torgerson, TORGERSON LAW OFFICE, for petitioner.

Kimberly R. Parker and Peter R. Marker, MINNESOTA ATTORNEY
GENERAL'S OFFICE, for respondent.

Orlando Bobadilla was convicted in a Minnesota state court of sexually assaulting T.B.,
his three-year-old nephew. T.B. did not testify at Bobadilla's trial, as the judge found that T.B.
was incompetent. But the judge did permit the prosecution to introduce into evidence a
videotaped statement that T.B. had given to a social worker and a police officer. In that
statement, T.B. accused Bobadilla of sexually assaulting him.

The Minnesota Court of Appeals overturned Bobadilla's conviction, holding that the
introduction of T.B.'s out-of-court statement violated Bobadilla's rights under the Confrontation
Clause. *State v. Bobadilla*, 690 N.W.2d 345, 349-50 (Minn. Ct. App. 2004). A divided
Minnesota Supreme Court reversed and reinstated Bobadilla's conviction. Over Justice Page's
dissent, the majority found that T.B.'s out-of-court statement was not "testimonial" for purposes
of *Crawford v. Washington*, 541 U.S. 36 (2004), and thus that introduction of the statement

against Bobadilla was not barred by the Confrontation Clause. *State v. Bobadilla*, 709 N.W.2d 243, 248-56 (Minn. 2006).

Bobadilla now petitions for a writ of habeas corpus under 28 U.S.C. § 2254. In a March 25, 2008 Report and Recommendation ("R&R"), Chief Magistrate Judge Raymond L. Erickson recommended that Bobadilla's petition be denied — not because Judge Erickson concluded that the decision of the Minnesota Supreme Court was correct, but because he concluded that, whether correct or not, the decision did not represent an unreasonable application of clearly established law for purposes of § 2254(d)(1). After carefully reviewing *Crawford*, the Minnesota Supreme Court's opinion, and the entire record (including the transcript of Bobadilla's trial), this Court concludes that the Minnesota Supreme Court did, in fact, unreasonably apply clearly established law in concluding that Bobadilla's right to confrontation was not violated by the introduction of T.B.'s out-of-court statement. For that reason, this Court grants Bobadilla's petition for a writ of habeas corpus.

## I. BACKGROUND

T.B.'s father and mother lived apart. T.B.'s mother lived with T.B. T.B.'s father lived at home with his own mother (T.B.'s grandmother), his stepfather, his brother Bobadilla (T.B.'s uncle), and a second brother. Trial Tr. 130, 173-74 [Docket No. 11] (hereinafter "TT ___"). On Friday, May 2, 2003, T.B.'s mother dropped off her son to spend the weekend with his father, grandmother, and other relatives. TT 143-44. T.B.'s mother picked up T.B. late on the evening of Sunday, May 4, took him home, and prepared him for bed. TT 144. While changing T.B.'s diaper, T.B's mother noticed redness near his anus and asked T.B. about it. TT 144. Using a

child's terminology, T.B. told his mother that Bobadilla had inserted a finger in his rectum. TT 144-45.

T.B.'s mother called T.B.'s father and told him what T.B. had said. TT 145. T.B's father, in turn, spoke to T.B.'s grandmother, and the grandmother urged T.B.'s parents to take T.B. to the emergency room at once. TT 181. T.B.'s father and grandmother picked up T.B.'s mother and T.B., and the four drove to Rice Memorial Hospital in Willmar, Minnesota. TT 181-82. At the hospital, T.B. was examined by an emergency-room physician. TT 182. The doctor determined that the redness around T.B.'s anus was consistent with the sexual abuse described by T.B. TT 155. A police officer was dispatched to the hospital, where he interviewed T.B.'s parents and an emergency-room nurse. TT 182; *Bobadilla*, 709 N.W.2d at 246-47. The officer forwarded his report to the Investigations Unit of the Willmar Police Department and to the Kandiyohi County Family Service Department. *Bobadilla*, 709 N.W.2d at 247.

Sometime later, Detective Matthew L. Akerson of the Willmar Police Department — the police officer leading the criminal investigation of Bobadilla — decided to interview T.B. Akerson contacted Cherlynn Molden, a social worker employed by the Kandiyohi County Family Service Department, and asked for her assistance with the interview. TT 117. Molden agreed to arrange the interview and to assist Akerson in questioning T.B. TT 117. Molden had difficulty reaching T.B.'s mother, but the two finally spoke on the morning of May 9, 2003. TT 129, 138. Later that day, T.B.'s mother and father brought T.B. to police headquarters, where they were greeted by Akerson and Molden and escorted to a special interview room designed to make children feel comfortable while being questioned about allegations of sexual abuse. TT 117, 119, 138-39. Molden sat next to T.B. and asked him questions; Akerson sat across from Molden

and T.B. and observed; and a camera hidden behind a one-way mirror recorded the interview.

TT 117-18, 119, 167.

Molden asked T.B. questions in a highly structured manner, following what is known as

the "CornerHouse protocol" or "CornerHouse technique" — an approach used by police officers,

social workers, and others in interviewing children about allegations of sexual abuse.  TT 114-

16.  The Minnesota Supreme Court described the CornerHouse approach as follows:

> The protocol consists of establishing rapport with the child,
> ascertaining the child's terms for parts of the anatomy, ascertaining
> whether abuse occurred, and closing with a "safety message."  The
> CornerHouse technique instructs the interviewer to ask nonleading
> questions, to use terms children would understand, and to progress
> quickly since young children have short attention spans.

*Bobadilla*, 709 N.W.2d at 247.

During the interview, T.B. told Molden and Akerson the same thing that he had told his

mother on the night that he had been taken to the hospital: that Bobadilla had inserted a finger in

T.B.'s rectum.  The key exchange was the following:

CPW[1]:         [H]as anybody hurt your body?

T.B.:           Mmm, MmmMmm (affirmative)

CPW:            Yeah. Who hurt your body?

T.B.:           Orlando did.

CPW:            Orlando did . . . . How did Orlando hurt your body?

T.B.:           He (inaudible) my (inaudible).

CPW:            What?

---

[1]"CPW" stands for "child-protection worker" — that is, Molden.

-4-

| | |
|---|---|
| T.B.: | He, he (inaudible) touch my (inaudible). |
| CPW: | (inaudible) your bootie.  Okay.  What did he do to your bootie? |
| T.B.: | (inaudible) put his finger in there. |
| CPW: | He just put his finger in there?  Okay . . . . |

*Bobadilla*, 709 N.W.2d at 247.

Bobadilla was charged with first- and second-degree criminal sexual conduct.  At trial, after speaking to T.B. at length, the judge found that he was not competent to testify.  TT 47. Over Bobadilla's objections, though, the judge permitted the prosecution to introduce evidence of T.B.'s out-of-court statements about the sexual assault.  Specifically, T.B.'s mother testified about the statement that T.B. made to her at home on May 4, and Molden testified about the statement that T.B. made to her and Akerson at police headquarters on May 9.  In addition, the prosecutor was permitted to play for the jury a videotape of the interview at police headquarters. Bobadilla was convicted and sentenced to 144 months in prison.

While Bobadilla's appeal was pending before the Minnesota Court of Appeals, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004).  In *Crawford*, the Supreme Court held that the Confrontation Clause forbids the admission of "testimonial" hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.  *Crawford*, 541 U.S. at 68.  Applying *Crawford*, the Minnesota Court of Appeals unanimously found that the statement made by T.B. during the interview at police headquarters was "testimonial" and therefore that the admission of the videotape of that interview, as well as Molden's testimony about T.B.'s statement, violated Bobadilla's right of confrontation.  *See State v. Bobadilla*, 690 N.W.2d 345, 349-50 (Minn. Ct. App. 2004).

The Minnesota Supreme Court granted the state's petition for review and, over Justice Page's strong dissent, reversed the decision of the Minnesota Court of Appeals.  The court held that the statement made by T.B. during the interview at police headquarters was not "testimonial" under *Crawford* and therefore its admission did not violate the Confrontation Clause.  *Bobadilla*, 709 N.W.2d at 246.  After the United States Supreme Court denied Bobadilla's petition for certiorari, Bobadilla filed this petition for habeas corpus.[2]

## II.  ANALYSIS

### A.  Standard of Review

Bobadilla seeks habeas relief on the ground that his conviction was obtained in violation of the Confrontation Clause.  There is no dispute that Bobadilla raised this claim at every stage of his state-court proceedings.  Bobadilla's claim is therefore properly before this Court as a fully exhausted claim that he is "in custody in violation of the Constitution . . . of the United States." 28 U.S.C. § 2254(a), (b)(1)(A).

Under § 2254(d), this Court cannot grant habeas relief to a state prisoner unless the state's adjudication of the prisoner's federal claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[2]In this proceeding, Bobadilla challenges only the admission of evidence of what T.B. said during his interview with Molden and Akerson at police headquarters; he does not challenge the admission of evidence of what T.B. said to his mother before he was taken to the hospital.

"[C]learly established Federal law" means the holdings, and not the dicta, of Supreme Court opinions that had been released prior to the date on which the state court issued its decision. *Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653 (2006). To act "contrary to" clearly established federal law, the state court must have either (1) arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, federal habeas relief is warranted if the state court identified the correct governing legal principle, but unreasonably applied that principle to the facts of the case. *Id.* at 413. It is not enough, under the "unreasonable application" clause, that the state court's decision was wrong, or even that it was clear error; the decision must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Finally, on habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### B. *Clearly Established Federal Law under* Crawford

The Confrontation Clause of the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The right of confrontation applies in state criminal proceedings by virtue of its incorporation into the Fourteenth Amendment's guarantee of due process. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The United States Supreme Court has long struggled to define when the Confrontation Clause prohibits the introduction of hearsay evidence against a defendant at a criminal trial. In

*Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court held that an out-of-court statement could not be admitted against a defendant unless the declarant was unavailable and the statement bore adequate "indicia of reliability." *Id.* at 66.  A showing that the statement fell within a "firmly rooted hearsay exception" was sufficient to establish its reliability (and hence its admissibility). *Id.*  But if the statement did not fall within a hearsay exception that was "firmly rooted," then the statement could not be admitted unless the prosecution made "a showing of particularized guarantees of trustworthiness." *Id.*

The *Roberts* rule of reliability was the subject of much criticism.  Courts and commentators faulted the approach as leading to unpredictable and inconsistent results and allowing the admission of evidence that plainly violated the core values protected by the Confrontation Clause.  The Supreme Court finally abandoned the *Roberts* approach in *Crawford v. Washington*, 541 U.S. 36 (2004), holding that the Confrontation Clause admitted of no "general reliability exception," *id.* at 62.  Justice Scalia, writing for the majority, explained:

> Admitting statements deemed reliable by a judge is fundamentally
> at odds with the right of confrontation.  To be sure, the Clause's
> ultimate goal is to ensure reliability of evidence, but it is a
> procedural rather than a substantive guarantee.  It commands, not
> that evidence be reliable, but that reliability be assessed in a
> particular manner: by testing in the crucible of cross-examination.
> The Clause thus reflects a judgment, not only about the desirability
> of reliable evidence (a point on which there could be little dissent),
> but about how reliability can best be determined.

*Id.* at 61.

Under *Crawford*, the admissibility of hearsay under the Confrontation Clause turns not on whether the out-of-court statement is reliable, but on whether the statement is "testimonial." Hearsay that is "testimonial" may not be admitted against a defendant unless the declarant is

unavailable and the defendant had a prior opportunity to cross-examine the declarant.  In this

case, Bobadilla did not have an opportunity to cross-examine T.B.  Thus, as both the Minnesota

Court of Appeals and the Minnesota Supreme Court recognized, if the statement that T.B. gave

to Molden and Akerson at police headquarters was "testimonial," then the Confrontation Clause

barred the use of that statement against Bobadilla.

The United States Supreme Court acknowledged in *Crawford* that "testimonial" has been

defined in different ways.  *Id.* at 51-52.  According to the Court, however, all of the definitions

"share a common nucleus," and thus, "[r]egardless of the precise articulation, some statements

qualify under any definition . . . ."  *Id.* at 52.  As the Court explained:

> Whatever else the term ["testimonial"] covers, it applies at a
> minimum to prior testimony at a preliminary hearing, before a
> grand jury, or at a former trial; *and to police interrogations*.  These
> are the modern practices with closest kinship to the abuses at
> which the Confrontation Clause was directed.

*Id.* at  68 (emphasis added).  The Court repeatedly cited "[s]tatements taken by police officers in

the course of interrogations" as statements that must be considered "testimonial" "under any

definition" or "under even a narrow standard."  *Id.* at 52.  "[E]ven if the Sixth Amendment is not

solely concerned with testimonial hearsay," the Court said, "that is its primary object, and

interrogations by law enforcement officers fall squarely within that class."  *Id.* at 53 (footnote

omitted).

It is true that the Supreme Court declined "to spell out a comprehensive definition of

'testimonial,'" *id.* at 68 — that is, a definition that would encompass statements beyond those

falling within the "common nucleus."  And it is also true that the Court acknowledged "that our

refusal to articulate a comprehensive definition in this case will cause interim uncertainty."  *Id.* at

68 n.10.  What is critical for purposes of this case, however, is the *reason* why the Court did not articulate a comprehensive definition of "testimonial."  The Court explained that articulating such a definition was unnecessary because the specific statement at issue in *Crawford* — a statement made by Sylvia Crawford, the defendant's wife — "[was] testimonial under any definition."  *Id.* at 61.  And the reason why Sylvia Crawford's testimony was "testimonial under any definition" was because the statement was taken in the course of a police interrogation.

In sum, while *Crawford* left much unsettled, the Supreme Court was absolutely clear that "[s]tatements taken by police officers in the course of interrogations" are "testimonial" and cannot be admitted unless the declarant is unavailable and the defendant has had an opportunity to cross-examine the declarant.  This holding was "clearly established Federal law, as determined by the Supreme Court of the United States," at the time that the Minnesota Supreme Court issued its decision in Bobadilla's case.  28 U.S.C. § 2254(d)(1).

### C.  The Minnesota Supreme Court's Decision

Despite the clarity of *Crawford*'s holding, the Minnesota Supreme Court did not directly address the question whether T.B.'s statement was "taken by police officers in the course of [an] interrogation[]."  Instead, the court addressed that question only by implication.

The court began its legal analysis by identifying its "sole inquiry" as "whether T.B.'s statements in the interview with the child-protection worker [Molden] were 'testimonial' under *Crawford*."  *Bobadilla*, 709 N.W.2d at 249.  (Of course, a police detective (Akerson) was also present during that interview, but the court ignored that fact throughout its legal analysis.)  The court said that, in distinguishing "testimonial" statements from "nontestimonial" statements, it would apply an eight-factor test that it had developed in an earlier case — *State v. Wright*, 701

-10-

N.W.2d 802, 812-13 (Minn. 2005).[3]  *Id.* at 250.  Under that test, two of the eight factors are

considered "central":  "the declarant's purpose in speaking with the officer" and "the officers'

purpose in speaking with the declarant."  *Id.*  The other six factors[4] are merely "probative" of

---

[3]In *Wright*, the Minnesota Supreme Court held that statements made by crime victims to 911 operators and to police officers during field investigations were not "testimonial."  *Wright*, 701 N.W.2d at 811, 814.  The United States Supreme Court vacated and remanded *Wright* for reconsideration in light of *Davis v. Washington*, 547 U.S. 813 (2006).  *See Wright v. Minnesota*, 126 S.Ct. 2979 (2006).  On remand, the Minnesota Supreme Court held again that statements made during 911 calls were not "testimonial," but the court concluded that, under *Davis*, statements made to police officers during field investigations were "testimonial."  *State v. Wright*, 726 N.W.2d 464, 474, 476 (Minn. 2007).

In *Davis*, the United States Supreme Court shed considerable light on the definition of "testimonial."  But because *Davis* was decided after the Minnesota Supreme Court reinstated Bobadilla's conviction, *Davis* is not part of the "clearly established Federal law" in light of which this Court must evaluate the court's decision.  The Court notes, however, that *Davis* refined *Crawford*'s holding that statements made during the course of police interrogations are "testimonial."  In *Davis*, the Court held that statements made during a police interrogation are "nontestimonial" when the circumstances objectively indicate that the primary purpose of the interrogation was to enable the police to meet an ongoing emergency.  *Davis*, 547 U.S. at 822.  To be clear, therefore, the term "police interrogation" as used in this opinion is meant to refer to a police interrogation like the one in *Crawford*: formal police questioning that took place some time after an alleged crime (and thus not under emergency circumstances) and that was structured to elicit from a victim or a witness a statement regarding the facts and circumstances of the crime.

[4]The entire test is as follows:

> (1) whether the declarant was a victim or an observer; (2) the declarant's purpose in speaking with the officer (e.g., to obtain assistance); (3) whether it was the police or the declarant who initiated the conversation; (4) the location where the statements were made (e.g., the declarant's home, a squad car, or the police station); (5) the declarant's emotional state when the statements were made; (6) the level of formality and structure of the conversation between the officer and declarant; (7) the officers' purpose in speaking with the declarant (e.g., to secure the scene, determine what happened, or collect evidence); and (8) if and how the statements were recorded.

those two central factors.  *Id.*  After refining its eight-factor test, the court held that "the key to

determining whether a statement is testimonial is whether *either* a declarant *or* government

questioner is acting, to a substantial degree, in order to produce a statement for trial."  *Id.* at 252

(emphasis added).  The court recognized that "[o]ften, government questioners and declarants

will have multiple purposes" in taking or giving a statement.  *Id.*  But, the court said, "the fact

that a statement is given or taken partially for reasons other than preservation for trial does not

preclude a determination that the statement is testimonial."  *Id.*

  In the view of the court, then, determining whether the statement that T.B. gave at police

headquarters was "testimonial" depended upon Molden's purpose in *asking* and T.B.'s purpose

in *answering* questions.  (Again, Akerson was ignored in the court's analysis.)  The court did not

explicitly address the question whether T.B.'s statement was taken during a police interrogation

because, the court said, "a reasonable questioner taking a statement" in the course of a police

interrogation "would *always* exhibit a substantial concern with producing a statement for use in

legal proceedings."  *Id.* at 253 (emphasis added).  In other words, the court did not believe that it

needed to inquire about whether T.B. gave a statement in the course of a police interrogation

until it first found that Molden's purpose in asking questions was to acquire evidence — because,

in the absence of such a purpose, the interview could not possibly have been a police

interrogation.

  The court then set out to identify Molden's purpose in asking questions of T.B., and

T.B.'s purpose in answering those questions.  The court described this as an objective, not

_____

*Wright*, 701 N.W.2d at 812-13.

subjective, inquiry. *Id.* In other words, the court did not inquire into Molden's or T.B.'s actual purposes. Rather, it asked what would have been the purpose of "a reasonable government questioner or declarant in the relevant situation." *Id.* The court also defined "the relevant situation" extraordinarily narrowly. As will be described below, about the only fact that the court considered relevant in determining T.B.'s purpose was his age, and about the only fact that the court considered relevant in determining Molden's purpose was the statute under which she was purportedly acting. Numerous facts that would seem relevant to either a subjective or objective inquiry into purpose were left out of the court's analysis entirely.

As for T.B., the court determined that his purpose in answering Molden's questions — or, more accurately, the purpose of a reasonable declarant in T.B.'s situation — was not to provide evidence for use against Bobadilla in criminal proceedings. The court based its conclusion almost entirely on T.B.'s age. In the court's words:

> given T.B.'s very young age, it is doubtful that he was even capable of understanding that his statements would be used at a trial. As amicus American Prosecutors Research Institute makes clear, children of T.B.'s age are simply unable to understand the legal system and the consequences of statements made during the legal process.

*Id.* at 255-56.

As for Molden, the court determined that Molden's purpose in asking questions — or, more accurately, the purpose of a reasonable government questioner in Molden's situation — was also not to elicit evidence against Bobadilla. The court based its conclusion almost solely on Minn. Stat. § 626.556 (2004).[5] Under that statute, when criminal child abuse is reported, that

---

[5]Section 626.556 has been amended frequently. The Minnesota Supreme Court quoted and relied on the version of § 626.556 in effect at the time Molden and Akerson were

report must be passed on to both the local welfare agency and law enforcement, and each plays a distinct role in responding to the report.  The local welfare agency must

> immediately conduct an assessment including gathering
> information on the existence of substance abuse and offer
> protective social services for purposes of preventing further abuses,
> safeguarding and enhancing the welfare of the abused or neglected
> minor, and preserving family life whenever possible.

Minn. Stat. § 626.556, subd. 10(a).  Law enforcement, of course, must conduct a criminal investigation.  And, according to the court, the "clearly delineated purpose" of the overall statutory scheme "is to protect the health and welfare of children."  *Bobadilla*, 709 N.W.2d at 254.

The court determined that Molden was not "acting, to a substantial degree, in order to produce a statement for trial" because she was interviewing T.B. "in accord with a statutory scheme for reporting, investigating, and responding to threats to children's health or welfare." *Id.*  As the court explained:

> Here, the interview of T.B. was initiated by a
> child-protection worker in response to a report of sexual abuse for
> the overriding purpose of assessing whether abuse occurred, and
> whether steps were therefore needed to protect the health and
> welfare of the child.  In the interview, the child-protection worker
> established rapport with T.B., identified the child's terms for
> human anatomy, made a touch and abuse inquiry, and closed the
> interview.  If part of the purpose of this interview was to produce a
> statement for use at a future trial, such a purpose was at best
> incidental to the main purpose: assessing and responding to
> imminent risks to T.B.'s health and welfare.  Much like the
> at-the-scene police questioning in *Wright*, the interview of T.B.
> "represent[s] a response to a call for assistance and preliminary
> determination of 'what happened' and whether there was

investigating T.B.'s allegations, and this Court's discussion refers only to that version.

> immediate danger, rather than an effort to gather evidence for a
> future trial."  701 N.W.2d at 813-14.

*Id.* at 255.  The court conceded that "an interview with more significant law-enforcement

involvement might . . . exhibit a greater purpose on the part of a declarant or government

questioner to produce statements for use at a future trial."  *Id.* at 256.  But, the court said,

> we conclude that in this case, neither T.B. nor the child-protection
> worker were acting, to a substantial degree, in order to produce a
> statement for trial, and therefore T.B.'s statements in the
> assessment interview were not testimonial.

*Id.*  Although the court did not say so specifically, its conclusion that Molden did not act to a

substantial degree to gather evidence against Bobadilla was necessarily a conclusion that her

interview of T.B. was not a police interrogation for purposes of *Crawford*.

### D.  Unreasonable Application of Clearly Established Federal Law

With due respect to the Minnesota Supreme Court, this Court holds that its decision in

Bobadilla's case represents an "unreasonable application of[] clearly established Federal law, as

determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).  Specifically,

this Court holds that the Minnesota Supreme Court's conclusion that T.B.'s statement was not

given in the course of a police interrogation for purposes of *Crawford* was objectively

unreasonable.

Justice Page had it exactly right:  The statement given by T.B. to Molden and Akerson

"fit[s] squarely within Crawford's pronouncement that '[s]tatements taken by police officers in

the course of interrogations are . . . testimonial under even a narrow standard."  *Bobadilla*, 709

N.W.2d at 258 (Page, J., dissenting) (quoting *Crawford*, 541 U.S. at 52).  Consider the

following:

1.  The interview of T.B. was conducted five days after the crime was committed.  As Justice Page explained, "the investigation in this case had already started, the police were involved before the interview occurred, [and] the identity of the suspect was known . . . ."  *Id.* (Page, J., dissenting).  This is strong evidence that T.B. was questioned in the course of a police interrogation.

Even accepting every fact relied on by the Minnesota Supreme Court as true, the court was simply incorrect in concluding that "[m]uch like the at-the-scene police questioning in *Wright*, the interview of T.B. 'represent[s] a response to a call for assistance and preliminary determination of "what happened" and whether there was immediate danger, rather than an effort to gather evidence for a future trial.'"  *Id.* at 255.  In T.B.'s case, the "call for assistance" had been placed *five days earlier*.  A police officer had responded to that call, going to the hospital, interviewing T.B.'s parents and an emergency-room nurse, making a "preliminary determination of 'what happened,'" and determining "whether there was immediate danger."  It was the statements given by T.B.'s parents and the emergency-room nurse — and not the statement given by T.B. several days later at police headquarters — that were comparable to the statements given to the police officers who responded to 911 calls in *Wright*.[6]

2.  The person who initiated the interview of T.B. was Akerson — the detective in charge of conducting the criminal investigation of Bobadilla.  This, too, is strong evidence that the interview was a police interrogation.

---

[6]As explained above (*see supra* at note 3), the Minnesota Supreme Court later abrogated its holding in *Wright* and determined that statements made to police officers during field investigations are indeed "testimonial."  *State v. Wright*, 726 N.W.2d 464, 476 (Minn. 2007).

Although the question of who initiated the interview was not determinative for the

Minnesota Supreme Court — and certainly is not determinative for this Court — it should

nevertheless be noted that the Minnesota Supreme Court's assertion that the interview of T.B.

"was initiated by a child-protection worker in response to a report of sexual abuse" is flatly

contracted by the testimony of that child-protection worker.  Molden testified as follows:

> Q.   At some point did you become involved in the interview of
> [T.B.]?
>
> A.   Yes, I did.
>
> Q.   And why don't you explain how that happened.
>
> A.   Sure.  *What happened is Detective Akerson from the Police
> Department asked me to assist him in interviewing [T.B.]*.
> I wasn't involved in that part of the investigation, but he
> asked me to assist him.
>
> Q.   And what happened when you got that call.
>
> A.   I made arrangements with [T.B.]'s mother to have him
> brought in to the Law Enforcement Center for the
> interview.

TT 117 (emphasis added).

3.  As noted, Molden was present at the interview because she was asked by Akerson to

assist him in the criminal investigation of Bobadilla.  Molden's testimony on this point was clear:

Molden said that she had *not* been involved "in that part of the investigation [that is, in the

criminal investigation], "*but* he asked me to assist him" — that is, "Detective Akerson from the

Police Department asked me to assist him in interviewing [T.B.]."  TT 117 (emphasis added).

This is strong evidence that, as Justice Page described it, Molden was acting as a "surrogate

interviewer" for the police in questioning T.B.  *Bobadilla*, 709 N.W.2d at 258 (Page, J., dissenting).

4.   The interview of T.B. took place at police headquarters, in a room specially designed for the interrogation of children regarding allegations of sexual abuse.  This, too, is evidence that the interview of T.B. was a police interrogation.

5.   There was nothing spontaneous or informal about the interview.  Rather, Molden — who had been trained in a "forensic" method of interviewing children (TT 115) — subjected T.B. to a highly structured series of questions.  Molden followed the "CornerHouse protocol, which . . . consists of establishing rapport with the child, ascertaining the child's terms for parts of the anatomy, ascertaining whether abuse occurred, and closing with a 'safety message.'"  *Bobadilla*, 709 N.W.2d at 247.  *Crawford* specifically identified "structured police questioning" as a hallmark of a police interrogation.  541 U.S. at 53 n.4.

6.   There is no evidence in the record — save the provisions of Minn. Stat. § 626.556 (which will be addressed below) — supporting the Minnesota Supreme Court's assertion that the "main purpose" of the interview of T.B. was "assessing and responding to imminent risks to T.B.'s health and welfare."  *Bobadilla*, 709 N.W.2d at 255.  Nor is there any evidence (save, again, the statute) supporting the court's assertion that the interview was initiated by Molden "for the overriding purpose of assessing whether abuse occurred, and whether steps were therefore needed to protect the health and welfare of the child."  *Id.*  Nothing in the record indicates that *a* purpose of either Molden or Akerson — much less a "main" or "overriding" purpose — was protecting T.B. from immediate or imminent danger.  To the contrary, two things point strongly in the opposite direction:

-18-

First, nothing in the record suggests that there *were* any "imminent risks to T.B.'s health and welfare" at the time of the interview on May 9.  Again, the abuse occurred, at the latest, on May 4 — five days earlier.  The abuse occurred not at T.B.'s home, but at his grandmother's home, during a weekend visit.  The culprit was not T.B.'s mother or father, but an uncle who did not live with T.B. and who had no access to T.B. without the permission of T.B's parents.  The abuse was not hidden by anyone:  T.B. reported the abuse to his mother within hours, T.B.'s mother immediately reported it to T.B.'s father, and T.B.'s father immediately reported it to T.B.'s grandmother.  T.B.'s parents and grandmother took the report seriously.  They promptly transported T.B. to an emergency room, and, after a police officer was called, they cooperated with his investigation.  When asked to bring T.B. in for an interview, the parents promptly complied, and both parents accompanied T.B. to police headquarters.  In short, the record suggests no reason to believe that T.B.'s parents were in any way responsible for the abuse, and no reason to believe that, after T.B. accused Bobadilla of abuse, T.B.'s parents were failing to protect him.  To the contrary, all of the evidence in the record (and described by the Minnesota Supreme Court) is that T.B.'s parents acted quickly and responsibly to protect their son's health and welfare.  Nothing mentioned by the Minnesota Supreme Court — and nothing that this Court has been able to find in the record — suggests that, by May 9, Molden or anyone else had reason to fear an "immediate danger" or "imminent risk" to T.B.

Second, reflecting this fact, there is no indication in either the Minnesota Supreme Court's opinion or the record that Molden asked T.B. the kind of questions that a social worker would have asked him if her "overriding" or "main" purpose was to assess "imminent" or

"immediate" risks to his health and welfare.  For example, Molden apparently[7] did not ask whether T.B. had recently seen Bobadilla or whether he was spending any time at his grandmother's house.  Instead of inquiring about possible risks to T.B., Molden asked a highly structured series of questions that appeared to be aimed toward one goal:  getting T.B. to repeat, on videotape, his assertion that Bobadilla had abused him.

In short, even if one accepts the Minnesota Supreme Court's view that an interview cannot be an "interrogation" unless acquiring evidence for use at trial is a substantial purpose of the questioner, the evidence is overwhelming that T.B.'s statement was taken in the course of an interrogation.  Even the item of evidence on which the court relied almost entirely — Minn. Stat. § 626.556 — supports this conclusion.

It is true that, under the statute, social workers such as Molden must act to protect the health and welfare of an abused child — and, toward that end, must "immediately conduct an assessment" of whether the child is in imminent danger.  Minn. Stat. § 626.556, subd. 10(a). And it is also true that, under the statute, law enforcement officers such as Akerson must conduct a criminal investigation.  But that does not mean that everything done by a social worker *must* be for the "overriding purpose" of protecting the child, anymore than it means that everything done by a police officer *must* be for the "overriding purpose" of collecting evidence.  Nothing in the statute prohibits social workers from helping collect evidence, and nothing forbids police officers from helping protect children.  If six months after T.B. was abused, the prosecutor handling

---

[7]The record before this Court does not contain a transcript of the full interview of T.B. The Court bases its assertions about that interview on the Minnesota Supreme Court's description of the interview, as well as information about the interview that appears in the trial transcript, briefs, and other documents included in the record.

Bobadilla's case asked Molden to help him videotape a statement for the upcoming trial, and

Molden complied by questioning T.B. before a video camera, it would be unreasonable to

conclude that Molden's "overriding purpose" was to protect T.B. from immediate danger just

because Molden was a social worker who had such an obligation under Minn. Stat. § 626.556.

More importantly, even if the statute was the *only* evidence about Molden's purpose —

or about the purpose of a reasonable social worker in Molden's position — it would still be

objectively unreasonable to conclude that eliciting evidence from T.B. was only an "incidental"

purpose of the interview.  This is because the statute specifically requires that "the local law

enforcement agency and local welfare agency shall coordinate the planning and execution of their

respective investigation and assessment efforts to avoid a duplication of fact-finding efforts and

multiple interviews."  Minn. Stat. § 626.556, subd. 10(a).  In other words, if a social worker such

as Molden needs to interview a victim such as T.B. to assess his need for protection, and if a

police officer such as Akerson needs to interview a victim such as T.B. as part of his criminal

investigation, then the social worker and the police officer are required to coordinate their efforts

so that both purposes can be achieved during the same interview.  And if a social worker such as

Molden needs to interview a victim immediately — before the criminal investigation has

commenced — she must, by statute, videotape the statement precisely so that police officers may

use that statement in lieu of interviewing the victim a second time.

The Minnesota Supreme Court explained this part of the statutory scheme as follows:

> Avoiding multiple interviews is a critical concern when dealing
> with children not only because the interviews are often traumatic
> for the child, but also because multiple interviews increase the
> chance that the children will be confused by unnecessarily
> suggestive questions.  That, by statute, the initial risk-assessment

> interview is recorded does not, therefore, necessarily indicate that the purpose of the interview was to create a formalized statement for trial.  Given the clear need to limit a child's exposure to stressful and confusing interviews, and the accompanying need to accurately assess risks to the child, there is a compelling need for a single recorded assessment interview solely in order to best protect the health and welfare of the child.

*Bobadilla*, 709 N.W.2d at 255.  The problem with this explanation is that it skips over the reason

*why* making a videotape of the assessment interview protects "the health and welfare of the

child."  It protects the child by minimizing the chances that the child will have to be interviewed

a second time, and it minimizes the chances that the child will have to be interviewed a second

time by giving law enforcement officers a recorded statement for use in their investigation.

Again, under § 626.556, the social worker's interview of a child is expressly intended to

substitute for a separate interrogation by the police.  The statute requires the social worker to

record the statement because the statute wants the social worker to kill two birds with one stone:

The social worker does an immediate interview to determine if action is needed to protect the

child from imminent danger, and the social worker records the statement so that the police can

use the interview in their investigation.  In Justice Page's words, the statute essentially makes the

social worker a "surrogate interviewer" for the police.  Thus, the statutory scheme — far from

suggesting that the *only* purpose of a social worker in interviewing a child is to assess his need

for protection — makes it quite clear that the interview is to serve *two* important purposes:  child

protection and criminal investigation.

In this case, of course, even if one assumes that Molden initiated the interview with T.B.

to assess his need for protection, Molden and Akerson coordinated their fact-finding efforts so

that there would be only one interview — an interview that was conducted pursuant to the statute

to meet both child-protection and criminal-investigation purposes.  Thus, in all legally relevant respects, the interview was not only the functional equivalent of police interrogation.  It *was* police interrogation — the one and only interrogation of T.B.  Even if the sole purpose of *Molden* was child protection (contrary to her testimony, and contrary to the other evidence), the purpose of the *interview* was both child protection and law enforcement.  That's why Akerson was sitting in the room with Molden and T.B.

Before concluding, this Court wishes to note its agreement with the Minnesota Supreme Court on one important point:  Nothing in *Crawford* suggests that statements taken during police interrogations are not "testimonial" if the statements are given by young children.  To hold that a young child's statement during a police interrogation is "nontestimonial" because of the age of the declarant would require carving out an exception to *Crawford*'s repeated and categorical assertion that statements taken in the course of police interrogations are "testimonial."  Such an exception finds no support in the text of *Crawford*, and it would be exceedingly difficult to justify in light of *Crawford*'s assertions that government involvement in the production of testimony presents a "unique potential for prosecutorial abuse," *Crawford*, 541 U.S. at 56 n.7, and that police interrogations are one of "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed."  *Crawford*, 541 U.S. at 68.  It would be extraordinary to hold that, notwithstanding the potential for prosecutorial abuse, the Confrontation Clause permits an exception for what is otherwise, without question, "testimonial" hearsay on the sole basis that the declarant is particularly young (and thus more vulnerable to manipulation than an adult).  Indeed, this Court is unaware of any case involving *Crawford*-like

-23-

police interrogation in which the court found an exception to *Crawford* solely on the grounds that the declarant was a young child.[8]

In sum, this Court is generally reluctant to find that any decision of a court as esteemed as the Minnesota Supreme Court is objectively unreasonable, even where, as here, that decision was contrary to the overwhelming weight of cases from other jurisdictions. *See Bobadilla*, 709 N.W.2d at 258 (Page, J., dissenting) (citing cases). But *Crawford* was absolutely clear that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." 541 U.S. at 52. And, although *Crawford* did not define "interrogation," it did make clear that it was "us[ing] the term 'interrogation' in its colloquial, rather than any technical legal, sense." *Id.* at 53 n.4.[9] For all of the reasons described above, this Court holds that it was objectively unreasonable for the Minnesota Supreme Court to conclude that a recorded interview of a child that was conducted at the request of a police detective, in that detective's presence, at a law-enforcement center, by a government actor specially trained in the forensic interviewing of children, pursuant to a statutory scheme requiring the police and the social-welfare agency to combine their investigatory efforts, that took place five days after the

---

[8]It should also be noted that, in *Crawford*, the Supreme Court discussed its prior decision in *White v. Illinois*, 502 U.S. 346 (1992), a case involving out-of-court statements given by a four-year-old victim of sexual abuse to a police officer (and others). *Crawford*, 541 U.S. at 58 n.8 (discussing *White*). Significantly, *Crawford* took as a given that the child's statements to the police officer were "testimonial." *Id.* The Court betrayed no doubt that a four-year-old child gives a "testimonial" statement when she answers the questions of a police officer, underscoring the unqualified nature of *Crawford*'s holding that "interrogations by law enforcement officers fall squarely within" the core class of "testimonial" statements. *Id.* at 53.

[9]Thus it is quite clear that a witness need not be suspected of a crime, or charged with a crime, or taken into custody, or given *Miranda* warnings before an interview of that witness is deemed to be an "interrogation" under *Crawford*.

event that was being investigated, when the child was clearly not in any immediate danger, and

that involved using highly structured questioning to elicit a statement inculpating a suspect, was

not a "police interrogation" within the meaning of *Crawford*.[10]

### C.  Harmless Error

This Court must finally assess whether the Minnesota Supreme Court's error was

harmless.[11]   The standard applicable on habeas review of a state-court decision is whether "the

error had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Toua*

*Hong Chang v. Minnesota*, 521 F.3d 828, 832 (8th Cir. 2008) (quoting *Brecht v. Abrahamson*,

507 U.S. 619, 623 (1993)).

> A substantial and injurious effect occurs when the court finds itself
> in grave doubt about the effect of the error on the jury's verdict.
> Grave doubt exists where the issue of harmlessness is so evenly

---

[10]It is somewhat unclear whether certain assertions of the Minnesota Supreme Court were factual findings or legal conclusions.  That is particularly true with respect to the assertion on which its ultimate holding depended: that Molden's "main" purpose in questioning T.B. was assessing imminent risks to his health, and that eliciting evidence was at most an "incidental" purpose.  Given that the Minnesota Supreme Court described this as an "objective" inquiry, and given that the court's conclusion about Molden's purpose rested almost entirely on its interpretation of a statute, this Court holds that the court's decision was "an unreasonable application of[] clearly established Federal law" for purposes of § 2254(d)(1).  But to the extent that the Minnesota Supreme Court's decision rests on what might be considered findings of fact, this Court holds that the court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" for purposes of § 2254(d)(2).

[11]The Minnesota Supreme Court did not address whether any Confrontation Clause error was harmless.  But the court rejected one of Bobadilla's state-law challenges to the admission of the social worker's testimony on the ground that the error, if any, was harmless given that the jury saw the videotape.  *Bobadilla*, 709 N.W.2d at 256.  Obviously, because that reasoning rests on the erroneous assumption that the admission of the videotape was proper, this Court need not defer to it.  *Cf. Fry v. Pliler*, 127 S. Ct. 2321, 2326 (2007) (noting that, when a state court determines that a constitutional violation was harmless, a federal court may not award habeas relief unless the harmlessness determination itself was unreasonable).

> balanced that the court feels itself in virtual equipoise as to the
> harmlessness of the error.

*Id.* (quotations, citations, and brackets omitted).  To consider whether the admission of the

evidence had "a substantial and injurious effect or influence in determining the jury's verdict,"

the court considers the following factors: (1) the importance of the evidence to the prosecution's

case; (2) whether the evidence was cumulative; (3) the presence or absence of corroborating or

contradictory evidence; (4) the extent of cross-examination otherwise permitted; and (5) the

overall strength of the prosecution's case.  *Id.* at 832-33.

Under this standard, this Court is unable to say that the admission of Molden's testimony

and the videotaped interview of T.B. were harmless.  Although the prosecution offered other

evidence of Bobadilla's guilt — most significantly, T.B.'s mother's testimony about T.B.'s

statement describing the assault, as well as the doctor's testimony about an unusual erythema

around T.B.'s rectum — the videotaped interview and Molden's testimony were clearly very

important (and likely crucial) to the prosecution's case.  The first two pieces of evidence that the

prosecutor presented to the jury in her case-in-chief were Molden's testimony and the videotape

of her interview of T.B.  The prosecutor discussed the videotape extensively in her opening

statement, calling it "[T.B.]'s opportunity to talk to you," and asking the jury to pay close

attention to T.B.'s demeanor during the interview.  TT 106.  T.B.'s statements during the

interview were more detailed than his bare-bones statement to his mother, and having a videotape

of the interview gave the jury the chance to actually see and hear T.B.  Moreover, given

Molden's special expertise in conducting forensic interviews of children, the jury would likely

have given her testimony about the interview (as well as the interview itself) great weight in its

deliberations.  Finally, Bobadilla was obviously completely precluded from cross-examining T.B. For these reasons, this Court finds that there is at least grave doubt about the effect of the error on the jury's verdict.  The Court therefore grants Bobadilla's petition for a writ of habeas corpus and vacates his conviction.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, the Court DECLINES TO ADOPT the March 25, 2008 R&R [Docket No. 34].  IT IS HEREBY ORDERED THAT:

1.    Petitioner's amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Docket No. 9] is GRANTED.

2.    The judgment and sentence in *State of Minnesota v. Orlando Manuel Bobadilla*, Case No. 34-K6-03-000942, Kandiyohi County District Court, is VACATED.

3.    Petitioner shall be released unless the State of Minnesota takes affirmative steps to reinstitute a criminal prosecution of petitioner within sixty days.

4.    Petitioner's objection [Docket No. 32] to the order denying his motions for an evidentiary hearing and for leave to appear at oral argument [Docket No. 31] is OVERRULED as moot.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  July 16, 2008                          s/Patrick J. Schiltz
                                               Patrick J. Schiltz
                                               United States District Judge